18CA0485 Peo v Tarr 10-24-2024 modified

COLORADO COURT OF APPEALS

---

Court of Appeals No. 18CA0485
Arapahoe County District Court No. 16CR2335
Honorable Ben L. Leutwyler III, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Christopher Oneil Tarr,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE LIPINSKY
Brown and Hawthorne*, JJ., concur

Opinion Modified
Petition for Rehearing GRANTED

Prior Opinion Announced February 24, 2022, Reversed in 22SC226

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 24, 2024

---

Philip J. Weiser, Attorney General, Brock J. Swanson, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Casey Mark Klekas, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

OPINION is modified as follows:

**Page 7, ¶ 17 currently reads:**

the trial court erred by concluding that the blood draws were admissible evidence.

**Opinion now reads:**

the trial court erred by concluding that evidence of Tarr's blood alcohol levels was admissible at his trial.

**Added subsection III.B. heading on page 8 reads:**

B.    Constitutionality under the Fourth Amendment to the United States Constitution and under Article II, Section 7 of the Colorado Constitution

**Added sentence on page 8, ¶ 19 reads:**

The Colorado and United States Supreme Courts have held that a blood draw is a search.  *People v. Schaufele*, 2014 CO 43, ¶ 20, 325 P.3d 1060, 1064; *see also Schmerber v. California*, 384 U.S. 757, 767 (1966).

**Added paragraphs 20-22 on pages 8-10 read:**

One of those exceptions is voluntary consent.  *See People v. Munoz-Gutierrez*, 2015 CO 9, ¶ 16, 342 P.3d 439, 444.  We focus on the consent exception because section 42-4-1301.1(3) is an expressed consent statute.

For consent to be valid, the defendant must have given consent voluntarily.  *See Munoz-Gutierrez*, ¶ 16, 342 P.3d at 444 ("Consent is voluntary if it is 'the product of an essentially free and unconstrained choice by its maker.'" (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973))).  Voluntariness is assessed through consideration of the totality of the circumstances.  *People v. Chavez-Barragan*, 2016 CO 66, ¶ 38, 379 P.3d 330, 339.  Notably, not until *Tarr II*, ¶ 22,

549 P.3d at 970, did the Colorado Supreme Court hold that "a conscious driver may revoke their statutory consent to a blood draw."

We conclude that Tarr did not consent to the warrantless blood draws. First, while at the hospital, Tarr informed the officers that they were "not taking [his] blood." *Id.* at ¶ 4, 549 P.3d at 967. Second, the officers testified that, although they were in the process of obtaining a search warrant, they nonetheless decided to proceed with the blood draws without a search warrant. *Id.* at ¶¶ 5-6, 549 P.3d at 967. Under the totality of the circumstances, we conclude that Tarr unequivocally refused to consent to the blood draws. Because the officers conducted the blood draws without a warrant and without consent, we conclude that the blood draws were an unreasonable search under the Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution.

**Page 8, ¶ 21 currently reads:**

*People v. Barry*, 2015 COA 4, ¶ 32, 349 P.3d 1139, 1149-50; *Davis v. United States*, 564 U.S. 229, 236 (2011).

**Opinion now reads (as ¶ 24):**

*People v. Barry*, 2015 COA 4, ¶ 32, 349 P.3d 1139, 1149-50; *see Davis v. United States*, 564 U.S. 229, 236 (2011).

**Page 9, ¶ 22 currently reads:**

But evidence should not be excluded unless the "deterrence benefits of suppression . . . outweigh its heavy costs." *Id.* at ¶ 33, 349 P.3d at 1149.

**Opinion now reads (as ¶ 25):**

> Evidence should not be excluded unless the "deterrence benefits of suppression . . . outweigh its heavy costs." *Id.* at ¶ 33, 349 P.3d at 1149.

**Page 9, ¶ 22 currently reads:**

> Accordingly,

**Opinion now reads (as ¶ 25):**

> Thus,

**Added paragraph 26 on page 11 reads:**

> In light of this case law, although we conclude that the warrantless draw of Tarr's blood was an unreasonable search, we must determine whether evidence of the blood draws was nonetheless admissible at Tarr's trial under an exception to the exclusionary rule. *See Tarr II*, ¶ 22, 549 P.3d at 970 ("[A]ny evidence obtained from [a warrantless] blood draw should be excluded from trial unless one of the recognized exceptions to the exclusionary rule applies."). For the reasons explained below, we conclude that the good faith exception applies under the facts of this case.

**Pages 9-10, ¶ 23 currently reads:**

> At the time Tarr's blood was drawn without a search warrant, section 42-4-1301.1(3) allowed a law enforcement officer to physically restrain a person to obtain a blood sample if the officer had probable cause to believe the person had committed vehicular homicide, among other offenses, and the person was refusing a blood test. *See* § 42-4-1301.1(3). The officers reasonably relied on the statute to mean that they could forcibly extract a blood sample from Tarr without a warrant. *Cf. People v. Lopez*, 2022 COA 70M, ¶ 27, 518 P.3d 775, 779 (holding that the good faith exception does not apply

where the law governing the constitutionality of a particular search is unsettled because, in that situation, the officer is just guessing at what the law might be).

**Opinion now reads (as ¶ 27):**

At the time the officers drew Tarr's blood without a search warrant, section 42-4-1301.1(3) allowed a law enforcement officer to physically restrain a person to obtain a blood sample if the officer had probable cause to believe the person had committed vehicular homicide, among other offenses, and the person was refusing to submit to a blood test. *See* § 42-4-1301.1(3); *see also Hyde*, ¶ 27, 393 P.3d at 968-69. The record establishes that the officers acted with an objectively reasonable good faith belief that section 42-4-1301.1(3) authorized them to forcibly extract a blood sample from Tarr without a warrant. *Cf. People v. Lopez*, 2022 COA 70M, ¶ 27, 518 P.3d 775, 779 (holding that the good faith exception does not apply where the law governing the constitutionality of a particular search is unsettled because, in that situation, the officer is just guessing at what the law might be). The evidence shows that the officers relied on their training when they decided to draw Tarr's blood without waiting for issuance of a warrant, and they did not violate Tarr's rights deliberately, recklessly, or with gross negligence. *See Barry*, ¶ 33, 349 P.3d at 1149-50; *see also Herring v. United States*, 555 U.S. 135, 143 (2009) ("[E]vidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" (quoting *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987))).

**Page 10, ¶ 23 currently reads:**

*Illinois v. Krull*, 480 U.S. 340, 349 50 (1987);

**Opinion now reads (as ¶ 28):**

*Krull*, 480 U.S. at 349-50;

**Page 11, ¶ 24 currently reads:**

The motorist agreed to submit to a blood test, and the officers did not apply for a search warrant to obtain the blood sample. *Id.* at 1242. The motorist later moved to suppress the results of the blood test as unconstitutional. *Id.* The Kansas Supreme Court subsequently held, in a different case, that warrantless blood tests are unconstitutional. *Id.*

**Opinion now reads (as ¶ 29):**

After being advised regarding the Kansas implied consent statute, the motorist agreed to submit to a blood test, and the officers did not apply for a search warrant to obtain the blood sample. *Id.* at 1242. (For purposes of our opinion, there is no meaningful distinction between a state's "implied consent" statute and an "expressed consent" statute.) The motorist later moved to suppress the results of the blood test as unconstitutional. *Id.* The Kansas Supreme Court subsequently held, in a different case, that implied consent advisories are impermissibly coercive, such that warrantless blood tests conducted under the implied consent statute are unconstitutional. *Id.*

**Added paragraphs 31-34 on pages 15-17 read:**

A second case, *State v. German*, 887 S.E.2d 912 (S.C. 2023), further shows why the good faith exception applies here. The facts in *German* are similar to those in Tarr's case. In *German*, a conscious driver refused to consent to a blood draw. *Id.* at 916. Although the driver refused to consent, the officers nonetheless conducted a blood draw pursuant to the South Carolina implied consent statute. *Id.* at 922. The South Carolina Supreme Court held in *German* that the statute was not facially constitutional, but was unconstitutional as applied

to the facts of the case, and that the officers violated the driver's Fourth Amendment rights. *Id.* at 922-23. Despite reaching this conclusion, the court reasoned that the officers acted in good faith, in accordance with the existing case law interpreting the implied consent statute. *Id.* at 925. Thus, the court held that evidence of the blood draw was admissible. *Id.*

Citing *Krull* — another good faith exception case involving a statute later held unconstitutional — Tarr argues that the good faith exception can *only* apply when the statute or other legal authority on which the officers relied when conducting the warrantless search was later held unconstitutional. But Tarr reads too much into *Krull.*

The good faith exception applies equally to involuntary blood draw cases in which, as in *Tarr II*, the officers relied on an expressed consent statute that a court later held cannot override a conscious driver's refusal to consent to a blood draw, *see Tarr II*, ¶ 22, 549 P.3d at 970, and to cases in which a court later struck down a similar statute as facially unconstitutional. It is thus of no consequence that the supreme court in *Tarr II* did not hold that section 42-4-1301.1(3) was facially unconstitutional.

The key in these cases is that "the law on which the officer relied was later *deemed invalid* — something the officer could not have foreseen." *Casillas v. People*, 2018 CO 78M, ¶ 31, 427 P.3d 804, 812 (emphasis added); *see also Krull*, 480 U.S. at 360 (concluding that the detective "relied, in objective good faith, on a statute that appeared legitimately to allow a warrantless administrative search of respondents' business"). As noted above, in *Tarr II*, the supreme court held for the first time in Colorado that the legal principle on which the officers relied in drawing Tarr's blood — that a conscious motorist believed to have committed vehicular homicide cannot revoke his statutory consent to a blood draw — was invalid. *See Tarr II*, ¶ 22, 549 P.3d at 970; § 42-4-1301.1(3). Thus, the good faith exception can apply here even though the officers did not

rely on a statute that the supreme court later held was unconstitutional.

**Page 12, ¶ 26 currently reads:**

As in the Kansas cases, the record in this case shows that the officers reasonably relied on Colorado's expressed consent statute in effect at the time in concluding they did not need a search warrant to draw Tarr's blood upon learning that the pedestrian Tarr struck had died from his injuries. Although they began the process of obtaining a search warrant, the blood draw took place before the issuance of the warrant.

**Opinion now reads (as ¶ 35):**

As in the Kansas and South Carolina cases, the record in this case shows that the officers reasonably relied on the expressed consent statute in effect at the time in concluding they did not need a search warrant to draw Tarr's blood upon learning that the pedestrian Tarr struck had died from his injuries. Although they began the process of obtaining a search warrant, the blood draws took place before the issuance of the warrant.

**Deleted paragraph 28 on page 13:**

Given the officers' reliance on the expressed consent statute, we conclude that the officers acted with an objectively reasonable good faith belief that their conduct was lawful. *See Barry*, ¶ 33, 349 P.3d at 1149-50.

**Pages 13-14, ¶ 29 currently reads:**

Significantly, at the time of the blood draw, no Colorado appellate decision had held that a motorist could revoke his statutory consent to a breath or blood test to determine alcohol levels. *Tarr II* was the first reported Colorado case to hold that a "conscious driver may revoke their statutory consent to a blood draw," and when that revocation occurs,

"the police are generally required to obtain a warrant before trying to conduct a blood draw." *Tarr II*, ¶ 22, 549 P.3d at 970. Thus, after *Tarr II*, police officers throughout Colorado are on notice that they must obtain a search warrant to obtain a blood sample from a motorist who revokes their statutory consent — even one whom the officers have probable cause to believe committed vehicular homicide. But police officers were not deemed to know that a warrant was required under these circumstances before the supreme court decided *Tarr II*.

**Opinion now reads (as ¶¶ 37-39):**

Significantly, at the time of the blood draws, no Colorado appellate court had held in a reported decision that a motorist believed to have committed vehicular homicide could revoke his statutory consent to a breath or blood test to determine alcohol levels. We conclude that the officers acted with an objectively reasonable good faith belief that their conduct was lawful, given their reliance on the plain language of section 42-4-1301.1(3) and the absence of a reported Colorado decision holding that a conscious driver suspected of vehicular homicide could withdraw the consent he was deemed to have given under the expressed consent statute. *See Tarr I*, ¶¶ 42-44, 511 P.3d at 682; *see also Barry*, ¶ 33, 349 P.3d at 1149-50. If in *Tarr I*, this division unanimously interpreted section 42-4-1301.1(3) and the existing case law to mean that, under the circumstances, Tarr had given unconditional consent to the blood draws through the statute, then it was objectively reasonable for the officers to interpret the statute the same way.

We reject Tarr's imposition of a condition precedent for applying the good faith exception not found in the case law — the officers' reliance on appellate precedent that "specifically authorized" this "particular police practice." That *Davis*, 564 U.S. at 241, involved "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent" does not mean that, as a general rule, the good faith exception is limited to those instances in which the officers conducted their

search in reliance on a specific prior case. As here, officers can rely on a reasonable reading of a statute that the appellate courts have not previously applied to the specific facts of their case. *See United States v. Lopez*, 951 F. Supp. 2d 657, 666 (D. Del. 2013) ("[A]pplication of the good faith exception is appropriate in this case despite the absence of binding appellate precedent."); *see also United States v. Blake*, No. 19-cr-00025, 2019 WL 3000804, at *2 (S.D.W. Va. July 9, 2019) (unpublished opinion) ("Even if a description or sample of the images is found to be necessary to permit an independent assessment by the reviewing magistrate, the absence of clear precedent in the Fourth Circuit on that point permits application of the good-faith exception.").

*Tarr II*, ¶ 22, 549 P.3d at 970, was the first reported Colorado case to hold that a "conscious driver may revoke their statutory consent to a blood draw," and when that revocation occurs, "the police are generally required to obtain a warrant before trying to conduct a blood draw." Thus, after *Tarr II*, police officers throughout Colorado are on notice that they must obtain a search warrant to obtain a blood sample from a motorist who revokes his statutory consent — even one who the officers have probable cause to believe committed vehicular homicide. But before the supreme court decided *Tarr II*, police officers in this state were not deemed to know that a warrant was required under these circumstances.

¶ 1     Christopher Oneil Tarr appeals his convictions for (1) driving under the influence (DUI); (2) reckless driving; (3) vehicular homicide – DUI; (4) vehicular homicide – reckless driving; (5) second degree murder; and (6) attempted second degree murder.

¶ 2     On February 24, 2022, a division of this court rejected Tarr's challenge to the admission at trial of evidence of his blood alcohol levels because, under Colorado's expressed consent statute, § 42-4-1301.1, C.R.S. 2024, and Colorado Supreme Court precedent, Tarr had not effectively revoked his statutory consent to a breath or blood test.  *See People v. Tarr*, 2022 COA 23, ¶¶ 42-44, 511 P.3d 672, 682 (*Tarr I*) (citing *People v. Hyde*, 2017 CO 24, ¶ 27, 393 P.3d 962, 968-69), *rev'd*, 2024 CO 37, 549 P.3d 966 (*Tarr II*). On June 3, 2024, the supreme court reversed the division's decision in *Tarr I*, holding that the broad language of *Hyde*, which concerned an unconscious driver, does not apply to conscious drivers who, like Tarr, revoke their statutory consent.  *Tarr II*, ¶¶ 20-23, 549 P.3d at 970.  The supreme court remanded the case to this court for "consideration of any outstanding arguments concerning the admissibility of the evidence in this case."  *Id.* at ¶ 23, 549 P.3d at 970.

¶ 3    On remand, we again affirm Tarr's convictions.

## I.    Background

¶ 4    After Tarr and a friend drank between one and three pitchers of beer at a bar, Tarr drove his car at a high rate of speed, ran a red light, and struck a pedestrian in a marked crosswalk. The pedestrian died from his injuries shortly after the collision.

¶ 5    Officer Ernest Gonzales of the Aurora Police Department spoke with Tarr following the crash. Although Tarr denied drinking alcohol that night, Officer Gonzales detected the smell of alcohol on him.

¶ 6    Officer Rolando Gomez, who arrived shortly thereafter, also smelled alcohol on Tarr's breath and noted that his speech was slurred. Tarr again denied that he had drunk alcohol that day; however, he admitted that he had smoked marijuana the previous day. Officer Gomez asked Tarr to perform roadside sobriety maneuvers. Tarr initially agreed, but, before Officer Gomez could administer the maneuvers, Tarr complained of a headache and was transported to a hospital.

¶ 7    At the hospital, the officers informed Tarr that, under the expressed consent statute, § 42-4-1301.1(2)(a)(I), he was deemed to

2

have consented to a breath or blood test to determine his blood alcohol levels. *Tarr II*, ¶ 4, 549 P.3d at 967. They also told him that a breath test was not available at the hospital and that he would need to submit to a blood draw. *Id.* The officers advised Tarr that his refusal to submit to such a test would result in the revocation of his license. Nonetheless, Tarr refused the blood test, stating unequivocally, "You're not taking my blood." *Id.*

¶ 8 In the meantime, Detective Joe Petrucelli began drafting an affidavit for a search warrant to support a blood draw through traditional Fourth Amendment procedures. *Id.* at ¶ 5, 549 P.3d at 967. Upon learning that the pedestrian had died, Detective Petrucelli informed the officers that, under the expressed consent statute, they could draw Tarr's blood by force, if necessary. *Id.* at ¶ 6, 549 P.3d at 967. (A law enforcement officer may physically restrain a person to obtain a blood sample if the officer has probable cause to believe that the person has committed vehicular homicide, among other offenses, and if the person is refusing a blood test. § 42-4-1301.1(3).)

¶ 9 Although Tarr confirmed that he would not consent to a blood test, he told the officers that he would not physically resist. *Tarr II,*

3

¶ 6, 549 P.3d at 967. Tarr's blood was drawn three times that morning — at 1:19, 2:19, and 3:15. (A forensic toxicologist testified at trial that blood draws over time allow a forensic toxicologist to estimate the rate at which an individual's body eliminates alcohol and then extrapolate the individual's blood alcohol content at a particular time.) The blood tests showed that Tarr's blood alcohol content was between .30 and .32 — roughly four times the limit for DUI.

¶ 10   A magistrate signed the search warrant thirty-five minutes after the third blood draw was completed. *Id.* at ¶ 7, 549 P.3d at 967.

## II.   Procedural History

¶ 11   The prosecution charged Tarr with (1) vehicular homicide – DUI; (2) vehicular homicide – reckless driving; (3) leaving the scene of a crash resulting in death; (4) DUI; and (5) reckless driving. It later added two additional charges: first degree murder – extreme indifference and attempted first degree murder – extreme indifference. (The charge of leaving the scene of a crash resulting in death was dismissed at a preliminary hearing.)

¶ 12    Tarr filed a pretrial motion to suppress the results of the blood draws. The trial court denied the motion, finding that the blood draws were "accomplished within the parameters of the [expressed consent statute], a recognized exception to the warrant requirement." The court further concluded that, even if the officers had obtained the evidence of Tarr's blood alcohol levels unlawfully, the evidence was nonetheless admissible under the inevitable discovery doctrine.

¶ 13    A jury convicted Tarr of the four remaining original charges and the lesser included offenses of the two additional charges — second degree murder and attempted second degree murder. The trial court merged Tarr's conviction for reckless driving with his conviction for vehicular homicide – reckless driving and merged Tarr's convictions for vehicular homicide – reckless driving and DUI with his conviction for vehicular homicide – DUI. Tarr appeals his convictions.

¶ 14    In *Tarr I*, the division resolved Tarr's appeal by holding that, under Colorado's expressed consent statute, § 42-4-1301.1, Tarr had irrevocably consented to a blood or breath test to determine his blood alcohol levels when requested by a law enforcement officer

having probable cause to believe that he was under the influence of alcohol, drugs, or both. *Tarr I*, ¶¶ 28, 42-44, 511 P.3d at 679, 682. *Tarr I* rested on the supreme court's broad pronouncement in *Hyde* that "there is no constitutional right to refuse a blood-alcohol test" under Colorado's expressed consent statute. *Id.* at ¶ 1, 511 P.3d at 676 (quoting *Hyde*, ¶ 27, 393 P.3d at 968-69). The division in *Tarr I* rejected Tarr's other arguments, which are not germane to our resolution of the outstanding issues on remand.

¶ 15   The supreme court granted certiorari in *Tarr II* to consider a single issue: "whether the Fourth Amendment's requirement that consent to a warrantless search be freely and voluntarily given is satisfied by Colorado's Expressed Consent Statute where a driver is conscious and clearly objects to a warrantless extraction of his blood." *Tarr II*, ¶ 11 n.1, 549 P.3d at 968 n.1. The supreme court declined to extend *Hyde* to circumstances involving "a conscious driver who is unequivocally revoking statutory consent" in light of recent United States Supreme Court precedent and its reading of the expressed consent statute as a whole. *Id.* at ¶¶ 18-21, 549 P.3d at 969-70.

¶ 16    On remand, we consider Tarr's argument that the results of his blood tests were inadmissible.

### III.    Analysis

¶ 17    Tarr contends that the blood draws were illegal searches under the Fourth Amendment to the United States Constitution and, for that reason, the trial court erred by concluding that evidence of Tarr's blood alcohol levels was admissible at his trial. Specifically, Tarr contends that the results of the blood draws are not admissible because (1) no exigent circumstances existed at the time, and (2) neither the inevitable discovery exception nor the good faith exception to the exclusionary rule applies.  We affirm because we conclude that the good faith exception to the exclusionary rule applies in this case.

### A.    Standard of Review

¶ 18    "Our review of a trial court's ruling on a motion to suppress presents a mixed question of fact and law.  We defer to the trial court's factual findings if those findings are supported by competent evidence in the record; however, we review the trial court's legal conclusions de novo." *People v. Shoen*, 2017 CO 65, ¶ 8, 395 P.3d 327, 330.

## B. Constitutionality under the Fourth Amendment to the United States Constitution and under Article II, Section 7 of the Colorado Constitution

¶ 19 The United States and Colorado Constitutions protect citizens from unreasonable searches and seizures of their homes and property. *See* U.S. Const. amend. IV; Colo. Const. art. II, § 7. The Colorado and United States Supreme Courts have held that a blood draw is a search. *People v. Schaufele*, 2014 CO 43, ¶ 20, 325 P.3d 1060, 1064; *see also Schmerber v. California*, 384 U.S. 757, 767 (1966).

¶ 20 "There is a presumption that a warrantless search is unreasonable and thus unconstitutional." *People v. Allen*, 2019 CO 88, ¶ 15, 450 P.3d 724, 728. "Nevertheless, the warrant requirement is subject to certain well-delineated exceptions because the touchstone of the Fourth Amendment is reasonableness." *Id.* One of those exceptions is voluntary consent. *See People v. Munoz-Gutierrez*, 2015 CO 9, ¶ 16, 342 P.3d 439, 444. We focus on the consent exception because section 42-4-1301.1(3) is an expressed consent statute.

¶ 21 For consent to be valid, the defendant must have given consent voluntarily. *See Munoz-Gutierrez*, ¶ 16, 342 P.3d at 444

("Consent is voluntary if it is 'the product of an essentially free and unconstrained choice by its maker.'" (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973))). Voluntariness is assessed through consideration of the totality of the circumstances. *People v. Chavez-Barragan*, 2016 CO 66, ¶ 38, 379 P.3d 330, 339. Notably, not until *Tarr II*, ¶ 22, 549 P.3d at 970, did the Colorado Supreme Court hold that "a conscious driver may revoke their statutory consent to a blood draw."

¶ 22 We conclude that Tarr did not consent to the warrantless blood draws. First, while at the hospital, Tarr informed the officers that they were "not taking [his] blood." *Id.* at ¶ 4, 549 P.3d at 967. Second, the officers testified that, although they were in the process of obtaining a search warrant, they nonetheless decided to proceed with the blood draws without a search warrant. *Id.* at ¶¶ 5-6, 549 P.3d at 967. Under the totality of the circumstances, we conclude that Tarr unequivocally refused to consent to the blood draws. Because the officers conducted the blood draws without a warrant and without consent, we conclude that the blood draws were an unreasonable search under the Fourth Amendment to the United

9

States Constitution and article II, section 7 of the Colorado Constitution.

### C. The Good Faith Exception

¶ 23 Under the exclusionary rule, "evidence that has been obtained in violation of the fourth amendment [must] be suppressed from presentation in the government's case-in-chief." *People v. Schoondermark*, 759 P.2d 715, 718 (Colo. 1988). Illegally obtained evidence can, however, be admissible if an exception to the exclusionary rule applies. *Id.*

¶ 24 "Exclusion of evidence obtained in violation of the Fourth Amendment is not a constitutional right, and the exclusionary rule is not designed to redress the injury of an unconstitutional search." *People v. Barry*, 2015 COA 4, ¶ 32, 349 P.3d 1139, 1149-50; *see Davis v. United States*, 564 U.S. 229, 236 (2011). Rather, "[t]he rule's sole purpose . . . is to deter future Fourth Amendment violations." *Barry*, ¶ 32, 349 P.3d at 1149 (quoting *Davis*, 564 U.S. at 236-37).

¶ 25 Evidence should not be excluded unless the "deterrence benefits of suppression . . . outweigh its heavy costs." *Id.* at ¶ 33, 349 P.3d at 1149. This is so because exclusion "almost always

requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.* (quoting *Davis*, 564 U.S. at 237). Thus,

> [w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.

*Id.* (quoting *Davis*, 564 U.S. at 238).

¶ 26    In light of this case law, although we conclude that the warrantless draw of Tarr's blood was an unreasonable search, we must determine whether evidence of the blood draws was nonetheless admissible at Tarr's trial under an exception to the exclusionary rule. *See Tarr II*, ¶ 22, 549 P.3d at 970 ("[A]ny evidence obtained from [a warrantless] blood draw should be excluded from trial unless one of the recognized exceptions to the exclusionary rule applies."). For the reasons explained below, we conclude that the good faith exception applies under the facts of this case.

¶ 27    At the time the officers drew Tarr's blood without a search warrant, section 42-4-1301.1(3) allowed a law enforcement officer to physically restrain a person to obtain a blood sample if the officer had probable cause to believe the person had committed vehicular homicide, among other offenses, and the person was refusing to submit to a blood test. *See* § 42-4-1301.1(3); *see also Hyde*, ¶ 27, 393 P.3d at 968-69. The record establishes that the officers acted with an objectively reasonable good faith belief that section 42-4-1301.1(3) authorized them to forcibly extract a blood sample from Tarr without a warrant. *Cf. People v. Lopez*, 2022 COA 70M, ¶ 27, 518 P.3d 775, 779 (holding that the good faith exception does not apply where the law governing the constitutionality of a particular search is unsettled because, in that situation, the officer is just guessing at what the law might be). The evidence shows that the officers relied on their training when they decided to draw Tarr's blood without waiting for issuance of a warrant, and they did not violate Tarr's rights deliberately, recklessly, or with gross negligence. *See Barry*, ¶ 33, 349 P.3d at 1149-50; *see also Herring v. United States*, 555 U.S. 135, 143 (2009) ("[E]vidence should be suppressed 'only if it can be said that the law enforcement officer

had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" (quoting *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987))).

¶ 28    As the United States Supreme Court noted,

> The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant. Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law.

*Krull*, 480 U.S. at 349-50; *see Feland v. State*, 142 S.W.3d 631, 633 (Ark. 2004) (explaining that "the good-faith exception to the exclusionary rule has been interpreted to extend to include evidence obtained by police who act in objectively reasonable reliance on a statute, even though that statute is later found unconstitutional").

¶ 29    The Kansas Supreme Court's reasoning in *City of Kingman v. Ary*, 475 P.3d 1240, 1247 (Kan. 2020), persuasively demonstrates why the good faith exception applies in this case. In *City of Kingman,* an officer authorized a warrantless blood draw of a motorist after the officer responded to a report of an automobile

13

crash. The officer noticed that the defendant — the driver of one of the vehicles — showed signs of impairment and arrested him. *Id.* at 1241-42. After being advised regarding the Kansas implied consent statute, the motorist agreed to submit to a blood test, and the officers did not apply for a search warrant to obtain the blood sample. *Id.* at 1242. (For purposes of our opinion, there is no meaningful distinction between a state's "implied consent" statute and an "expressed consent" statute.) The motorist later moved to suppress the results of the blood test as unconstitutional. *Id.* The Kansas Supreme Court subsequently held, in a different case, that implied consent advisories are impermissibly coercive, such that warrantless blood tests conducted under the implied consent statute are unconstitutional. *Id.*

¶ 30 Nonetheless, the court held in *City of Kingman* that evidence of the warrantless blood test was admissible under the good faith exception to the exclusionary rule. *Id.* at 1248. The court explained that the arresting officer was "merely fulfilling his responsibility to enforce the statutes as written" when he authorized the warrantless blood draw, and that the officer had no reason to know that the Kansas Supreme Court would later hold

14

the implied consent statute unconstitutional.  *Id.* at 1247.  Under these circumstances, "suppression of the evidence would not serve the deterrent aim of the exclusionary rule."  *Id.*  (The Kansas Supreme Court reached the same result in a companion case to *City of Kingman* — *State v. Heim*, 475 P.3d 1248, 1256 (Kan. 2020).)

¶ 31    A second case, *State v. German*, 887 S.E.2d 912 (S.C. 2023), further shows why the good faith exception applies here.  The facts in *German* are similar to those in Tarr's case.  In *German*, a conscious driver refused to consent to a blood draw.  *Id.* at 916. Although the driver refused to consent, the officers nonetheless conducted a blood draw pursuant to the South Carolina implied consent statute.  *Id.* at 922.  The South Carolina Supreme Court held in *German* that the statute was not facially constitutional, but was unconstitutional as applied to the facts of the case, and that the officers violated the driver's Fourth Amendment rights.  *Id.* at 922-23.  Despite reaching this conclusion, the court reasoned that the officers acted in good faith, in accordance with the existing case law interpreting the implied consent statute.  *Id.* at 925.  Thus, the court held that evidence of the blood draw was admissible.  *Id.*

¶ 32     Citing *Krull* — another good faith exception case involving a statute later held unconstitutional — Tarr argues that the good faith exception can *only* apply when the statute or other legal authority on which the officers relied when conducting the warrantless search was later held unconstitutional. But Tarr reads too much into *Krull.*

¶ 33     The good faith exception applies equally to involuntary blood draw cases in which, as in *Tarr II*, the officers relied on an expressed consent statute that a court later held cannot override a conscious driver's refusal to consent to a blood draw, *see Tarr II*, ¶ 22, 549 P.3d at 970, and to cases in which a court later struck down a similar statute as facially unconstitutional. It is thus of no consequence that the supreme court in *Tarr II* did not hold that section 42-4-1301.1(3) was facially unconstitutional.

¶ 34     The key in these cases is that "the law on which the officer relied was later *deemed invalid* — something the officer could not have foreseen." *Casillas v. People*, 2018 CO 78M, ¶ 31, 427 P.3d 804, 812 (emphasis added); *see also Krull*, 480 U.S. at 360 (concluding that the detective "relied, in objective good faith, on a statute that appeared legitimately to allow a warrantless

16

administrative search of respondents' business").  As noted above, in *Tarr II*, the supreme court held for the first time in Colorado that the legal principle on which the officers relied in drawing Tarr's blood — that a conscious motorist believed to have committed vehicular homicide cannot revoke his statutory consent to a blood draw — was invalid.  *See Tarr II*, ¶ 22, 549 P.3d at 970; § 42-4-1301.1(3).  Thus, the good faith exception can apply here even though the officers did not rely on a statute that the supreme court later held was unconstitutional.

¶ 35    As in the Kansas and South Carolina cases, the record in this case shows that the officers reasonably relied on the expressed consent statute in effect at the time in concluding they did not need a search warrant to draw Tarr's blood upon learning that the pedestrian Tarr struck had died from his injuries.  Although they began the process of obtaining a search warrant, the blood draws took place before the issuance of the warrant.

¶ 36    At a pretrial hearing, Detective Petrucelli testified as follows:

> DEFENSE COUNSEL: You had this discussion
> with Officer Gomez *when you found out the*
> *victim . . . had died, did you instruct Officer*
> *Gomez to go ahead with the blood draw at that*
> *point?*

17

DETECTIVE PETRUCELLI: *Yes.*

DEFENSE COUNSEL: Why was that, sir?

DETECTIVE PETRUCELLI: It was our procedure that I'm there, I'm starting the warrant, *and when we have a fatality, to start taking blood.*

DEFENSE COUNSEL: Is it your understanding that there is an actual Colorado statute that allows law enforcement to take blood samples or require blood samples in the event of a vehicular homicide?

DETECTIVE PETRUCELLI: Yes, I am.

DEFENSE COUNSEL: *Was your knowledge or belief in that statute what drove you to, basically, tell Officer Gomez to go forward with the blood draw?*

DETECTIVE PETRUCELLI: *That's correct.*

(Emphases added.)

¶ 37    Significantly, at the time of the blood draws, no Colorado appellate court had held in a reported decision that a motorist believed to have committed vehicular homicide could revoke his statutory consent to a breath or blood test to determine alcohol levels.  We conclude that the officers acted with an objectively reasonable good faith belief that their conduct was lawful, given their reliance on the plain language of section 42-4-1301.1(3) and

18

the absence of a reported Colorado decision holding that a conscious driver suspected of vehicular homicide could withdraw the consent he was deemed to have given under the expressed consent statute. *See Tarr I,* ¶¶ 42-44, 511 P.3d at 682; *see also Barry,* ¶ 33, 349 P.3d at 1149-50. If in *Tarr I*, this division unanimously interpreted section 42-4-1301.1(3) and the existing case law to mean that, under the circumstances, Tarr had given unconditional consent to the blood draws through the statute, then it was objectively reasonable for the officers to interpret the statute the same way.

¶ 38     We reject Tarr's imposition of a condition precedent for applying the good faith exception not found in the case law — the officers' reliance on appellate precedent that "specifically authorized" this "particular police practice." That *Davis,* 564 U.S. at 241, involved "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent" does not mean that, as a general rule, the good faith exception is limited to those instances in which the officers conducted their search in reliance on a specific prior case. As here, officers can rely on a reasonable reading of a statute that the appellate courts have not previously applied to the

specific facts of their case. *See United States v. Lopez*, 951 F. Supp. 2d 657, 666 (D. Del. 2013) ("[A]pplication of the good faith exception is appropriate in this case despite the absence of binding appellate precedent."); *see also United States v. Blake*, No. 19-cr-00025, 2019 WL 3000804, at *2 (S.D.W. Va. July 9, 2019) (unpublished opinion) ("Even if a description or sample of the images is found to be necessary to permit an independent assessment by the reviewing magistrate, the absence of clear precedent in the Fourth Circuit on that point permits application of the good-faith exception.").

¶ 39    *Tarr II*, ¶ 22, 549 P.3d at 970, was the first reported Colorado case to hold that a "conscious driver may revoke their statutory consent to a blood draw," and when that revocation occurs, "the police are generally required to obtain a warrant before trying to conduct a blood draw." Thus, after *Tarr II*, police officers throughout Colorado are on notice that they must obtain a search warrant to obtain a blood sample from a motorist who revokes his statutory consent — even one who the officers have probable cause to believe committed vehicular homicide. But before the supreme court decided *Tarr II*, police officers in this state were not deemed to know that a warrant was required under these circumstances.

¶ 40    For these reasons, we hold that the trial court did not err by denying Tarr's pretrial motion to suppress the results of the blood draws, albeit on grounds other than those on which the trial court relied. *See Moody v. People*, 159 P.3d 611, 615 (Colo. 2007) (holding that appellate courts have the discretion to affirm decisions on any basis for which there is a record sufficient to permit conclusions of law, even though they may be on grounds other than those on which the trial court relied).

## D.    Other Contentions

¶ 41    Because we resolve this case based on the good faith exception to the exclusionary rule, we decline to reach Tarr's remaining contentions. *See, e.g., People v. Vazquez*, 768 P.2d 721, 727 (Colo. App. 1988) ("Because of the result we reach here, we decline to address defendant's other contentions of error.").

## IV.    Disposition

¶ 42    The judgment of conviction is affirmed.

JUDGE BROWN and JUDGE HAWTHORNE concur.

18CA0485 Peo v Tarr 10-24-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 18CA0485
Arapahoe County District Court No. 16CR2335
Honorable Ben L. Leutwyler III, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Christopher Oneil Tarr,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE LIPINSKY
Brown and Hawthorne*, JJ., concur

Prior Opinion Announced February 24, 2022, Reversed in 22SC226

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 24, 2024

Philip J. Weiser, Attorney General, Brock J. Swanson, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Casey Mark Klekas, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Christopher Oneil Tarr appeals his convictions for (1) driving under the influence (DUI); (2) reckless driving; (3) vehicular homicide – DUI; (4) vehicular homicide – reckless driving; (5) second degree murder; and (6) attempted second degree murder.

¶ 2     On February 24, 2022, a division of this court rejected Tarr's challenge to the admission at trial of evidence of his blood alcohol levels because, under Colorado's expressed consent statute, § 42-4-1301.1, C.R.S. 2024, and Colorado Supreme Court precedent, Tarr had not effectively revoked his statutory consent to a breath or blood test.  *See People v. Tarr*, 2022 COA 23, ¶¶ 42-44, 511 P.3d 672, 682 (*Tarr I*) (citing *People v. Hyde*, 2017 CO 24, ¶ 27, 393 P.3d 962, 968-69), *rev'd*, 2024 CO 37, 549 P.3d 966 (*Tarr II*). On June 3, 2024, the supreme court reversed the division's decision in *Tarr I*, holding that the broad language of *Hyde*, which concerned an unconscious driver, does not apply to conscious drivers who, like Tarr, revoke their statutory consent.  *Tarr II*, ¶¶ 20-23, 549 P.3d at 970.  The supreme court remanded the case to this court for "consideration of any outstanding arguments concerning the admissibility of the evidence in this case."  *Id.* at ¶ 23, 549 P.3d at 970.

¶ 3    On remand, we again affirm Tarr's convictions.

## I.    Background

¶ 4    After Tarr and a friend drank between one and three pitchers of beer at a bar, Tarr drove his car at a high rate of speed, ran a red light, and struck a pedestrian in a marked crosswalk.  The pedestrian died from his injuries shortly after the collision.

¶ 5    Officer Ernest Gonzales of the Aurora Police Department spoke with Tarr following the crash.  Although Tarr denied drinking alcohol that night, Officer Gonzales detected the smell of alcohol on him.

¶ 6    Officer Rolando Gomez, who arrived shortly thereafter, also smelled alcohol on Tarr's breath and noted that his speech was slurred.  Tarr again denied that he had drunk alcohol that day; however, he admitted that he had smoked marijuana the previous day.  Officer Gomez asked Tarr to perform roadside sobriety maneuvers.  Tarr initially agreed, but, before Officer Gomez could administer the maneuvers, Tarr complained of a headache and was transported to a hospital.

¶ 7    At the hospital, the officers informed Tarr that, under the expressed consent statute, § 42-4-1301.1(2)(a)(I), he was deemed to

2

have consented to a breath or blood test to determine his blood alcohol levels. *Tarr II*, ¶ 4, 549 P.3d at 967. They also told him that a breath test was not available at the hospital and that he would need to submit to a blood draw. *Id.* The officers advised Tarr that his refusal to submit to such a test would result in the revocation of his license. Nonetheless, Tarr refused the blood test, stating unequivocally, "You're not taking my blood." *Id.*

¶ 8 In the meantime, Detective Joe Petrucelli began drafting an affidavit for a search warrant to support a blood draw through traditional Fourth Amendment procedures. *Id.* at ¶ 5, 549 P.3d at 967. Upon learning that the pedestrian had died, Detective Petrucelli informed the officers that, under the expressed consent statute, they could draw Tarr's blood by force, if necessary. *Id.* at ¶ 6, 549 P.3d at 967. (A law enforcement officer may physically restrain a person to obtain a blood sample if the officer has probable cause to believe that the person has committed vehicular homicide, among other offenses, and if the person is refusing a blood test. § 42-4-1301.1(3).)

¶ 9 Although Tarr confirmed that he would not consent to a blood test, he told the officers that he would not physically resist. *Tarr II*,

¶ 6, 549 P.3d at 967. Tarr's blood was drawn three times that morning — at 1:19, 2:19, and 3:15. (A forensic toxicologist testified at trial that blood draws over time allow a forensic toxicologist to estimate the rate at which an individual's body eliminates alcohol and then extrapolate the individual's blood alcohol content at a particular time.) The blood tests showed that Tarr's blood alcohol content was between .30 and .32 — roughly four times the limit for DUI.

¶ 10 A magistrate signed the search warrant thirty-five minutes after the third blood draw was completed. *Id.* at ¶ 7, 549 P.3d at 967.

## II. Procedural History

¶ 11 The prosecution charged Tarr with (1) vehicular homicide – DUI; (2) vehicular homicide – reckless driving; (3) leaving the scene of a crash resulting in death; (4) DUI; and (5) reckless driving. It later added two additional charges: first degree murder – extreme indifference and attempted first degree murder – extreme indifference. (The charge of leaving the scene of a crash resulting in death was dismissed at a preliminary hearing.)

¶ 12    Tarr filed a pretrial motion to suppress the results of the blood draws. The trial court denied the motion, finding that the blood draws were "accomplished within the parameters of the [expressed consent statute], a recognized exception to the warrant requirement." The court further concluded that, even if the officers had obtained the evidence of Tarr's blood alcohol levels unlawfully, the evidence was nonetheless admissible under the inevitable discovery doctrine.

¶ 13    A jury convicted Tarr of the four remaining original charges and the lesser included offenses of the two additional charges — second degree murder and attempted second degree murder. The trial court merged Tarr's conviction for reckless driving with his conviction for vehicular homicide – reckless driving and merged Tarr's convictions for vehicular homicide – reckless driving and DUI with his conviction for vehicular homicide – DUI. Tarr appeals his convictions.

¶ 14    In *Tarr I*, the division resolved Tarr's appeal by holding that, under Colorado's expressed consent statute, § 42-4-1301.1, Tarr had irrevocably consented to a blood or breath test to determine his blood alcohol levels when requested by a law enforcement officer

having probable cause to believe that he was under the influence of alcohol, drugs, or both. *Tarr I*, ¶¶ 28, 42-44, 511 P.3d at 679, 682. *Tarr I* rested on the supreme court's broad pronouncement in *Hyde* that "there is no constitutional right to refuse a blood-alcohol test" under Colorado's expressed consent statute. *Id.* at ¶ 1, 511 P.3d at 676 (quoting *Hyde*, ¶ 27, 393 P.3d at 968-69). The division in *Tarr I* rejected Tarr's other arguments, which are not germane to our resolution of the outstanding issues on remand.

¶ 15    The supreme court granted certiorari in *Tarr II* to consider a single issue: "whether the Fourth Amendment's requirement that consent to a warrantless search be freely and voluntarily given is satisfied by Colorado's Expressed Consent Statute where a driver is conscious and clearly objects to a warrantless extraction of his blood." *Tarr II*, ¶ 11 n.1, 549 P.3d at 968 n.1. The supreme court declined to extend *Hyde* to circumstances involving "a conscious driver who is unequivocally revoking statutory consent" in light of recent United States Supreme Court precedent and its reading of the expressed consent statute as a whole. *Id.* at ¶¶ 18-21, 549 P.3d at 969-70.

¶ 16    On remand, we consider Tarr's argument that the results of his blood tests were inadmissible.

## III.    Analysis

¶ 17    Tarr contends that the blood draws were illegal searches under the Fourth Amendment to the United States Constitution and, for that reason, the trial court erred by concluding that the blood draws were admissible evidence.  Specifically, Tarr contends that the results of the blood draws are not admissible because (1) no exigent circumstances existed at the time, and (2) neither the inevitable discovery exception nor the good faith exception to the exclusionary rule applies.  We affirm because we conclude that the good faith exception to the exclusionary rule applies in this case.

### A.    Standard of Review

¶ 18    "Our review of a trial court's ruling on a motion to suppress presents a mixed question of fact and law.  We defer to the trial court's factual findings if those findings are supported by competent evidence in the record; however, we review the trial court's legal conclusions de novo." *People v. Shoen*, 2017 CO 65, ¶ 8, 395 P.3d 327, 330.

## B.    The Good Faith Exception

¶ 19    The United States and Colorado Constitutions protect citizens from unreasonable searches and seizures of their homes and property.  *See* U.S. Const. amend. IV; Colo. Const. art. II, § 7.  "There is a presumption that a warrantless search is unreasonable and thus unconstitutional." *People v. Allen*, 2019 CO 88, ¶ 15, 450 P.3d 724, 728.  "Nevertheless, the warrant requirement is subject to certain well-delineated exceptions because the touchstone of the Fourth Amendment is reasonableness." *Id.*

¶ 20    Under the exclusionary rule, "evidence that has been obtained in violation of the fourth amendment [must] be suppressed from presentation in the government's case-in-chief." *People v. Schoondermark*, 759 P.2d 715, 718 (Colo. 1988).  Illegally obtained evidence can, however, be admissible if an exception to the exclusionary rule applies.  *Id.*

¶ 21    "Exclusion of evidence obtained in violation of the Fourth Amendment is not a constitutional right, and the exclusionary rule is not designed to redress the injury of an unconstitutional search." *People v. Barry*, 2015 COA 4, ¶ 32, 349 P.3d 1139, 1149-50; *Davis v. United States*, 564 U.S. 229, 236 (2011).  Rather, "[t]he rule's sole

purpose . . . is to deter future Fourth Amendment violations."

*Barry*, ¶ 32, 349 P.3d at 1149 (quoting *Davis*, 564 U.S. at 236-37).

¶ 22    But evidence should not be excluded unless the "deterrence benefits of suppression . . . outweigh its heavy costs."  *Id.* at ¶ 33, 349 P.3d at 1149.  This is so because exclusion "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence."  *Id.* (quoting *Davis*, 564 U.S. at 237). Accordingly,

> [w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs.  But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.

*Id.* (quoting *Davis*, 564 U.S. at 238).

¶ 23    At the time Tarr's blood was drawn without a search warrant, section 42-4-1301.1(3) allowed a law enforcement officer to physically restrain a person to obtain a blood sample if the officer had probable cause to believe the person had committed vehicular homicide, among other offenses, and the person was refusing a

blood test. *See* § 42-4-1301.1(3). The officers reasonably relied on the statute to mean that they could forcibly extract a blood sample from Tarr without a warrant. *Cf. People v. Lopez*, 2022 COA 70M, ¶ 27, 518 P.3d 775, 779 (holding that the good faith exception does not apply where the law governing the constitutionality of a particular search is unsettled because, in that situation, the officer is just guessing at what the law might be). As the United States Supreme Court noted,

> The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant. Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law.

*Illinois v. Krull*, 480 U.S. 340, 349-50 (1987); *see Feland v. State*, 142 S.W.3d 631, 633 (Ark. 2004) (explaining that "the good-faith exception to the exclusionary rule has been interpreted to extend to include evidence obtained by police who act in objectively reasonable reliance on a statute, even though that statute is later found unconstitutional").

¶ 24    The Kansas Supreme Court's reasoning in *City of Kingman v.*
*Ary*, 475 P.3d 1240, 1247 (Kan. 2020), persuasively demonstrates
why the good faith exception applies in this case.  In *City of*
*Kingman*, an officer authorized a warrantless blood draw of a
motorist after the officer responded to a report of an automobile
crash.  The officer noticed that the defendant — the driver of one of
the vehicles — showed signs of impairment and arrested him.  *Id.* at
1241-42.  The motorist agreed to submit to a blood test, and the
officers did not apply for a search warrant to obtain the blood
sample.  *Id.* at 1242.  The motorist later moved to suppress the
results of the blood test as unconstitutional.  *Id.*  The Kansas
Supreme Court subsequently held, in a different case, that
warrantless blood tests are unconstitutional.  *Id.*

¶ 25    Nonetheless, the court held in *City of Kingman* that evidence of
the warrantless blood test was admissible under the good faith
exception to the exclusionary rule.  *Id.* at 1248.  The court
explained that the arresting officer was "merely fulfilling his
responsibility to enforce the statutes as written" when he
authorized the warrantless blood draw, and that the officer had no
reason to know that the Kansas Supreme Court would later hold

11

the implied consent statute unconstitutional. *Id.* at 1247. Under these circumstances, "suppression of the evidence would not serve the deterrent aim of the exclusionary rule." *Id.* (The Kansas Supreme Court reached the same result in a companion case to *City of Kingman — State v. Heim*, 475 P.3d 1248, 1256 (Kan. 2020).)

¶ 26     As in the Kansas cases, the record in this case shows that the officers reasonably relied on Colorado's expressed consent statute in effect at the time in concluding they did not need a search warrant to draw Tarr's blood upon learning that the pedestrian Tarr struck had died from his injuries. Although they began the process of obtaining a search warrant, the blood draw took place before the issuance of the warrant.

¶ 27     At a pretrial hearing, Detective Petrucelli testified as follows:

> DEFENSE COUNSEL: You had this discussion with Officer Gomez *when you found out the victim . . . had died, did you instruct Officer Gomez to go ahead with the blood draw at that point?*
>
> DETECTIVE PETRUCELLI: *Yes.*
>
> DEFENSE COUNSEL: Why was that, sir?
>
> DETECTIVE PETRUCELLI: It was our procedure that I'm there, I'm starting the

warrant, *and when we have a fatality, to start taking blood.*

DEFENSE COUNSEL: Is it your understanding that there is an actual Colorado statute that allows law enforcement to take blood samples or require blood samples in the event of a vehicular homicide?

DETECTIVE PETRUCELLI: Yes, I am.

DEFENSE COUNSEL: *Was your knowledge or belief in that statute what drove you to, basically, tell Officer Gomez to go forward with the blood draw?*

DETECTIVE PETRUCELLI: *That's correct.*

(Emphases added.)

¶ 28   Given the officers' reliance on the expressed consent statute, we conclude that the officers acted with an objectively reasonable good faith belief that their conduct was lawful. *See Barry*, ¶ 33, 349 P.3d at 1149-50.

¶ 29   Significantly, at the time of the blood draw, no Colorado appellate decision had held that a motorist could revoke his statutory consent to a breath or blood test to determine alcohol levels. *Tarr II* was the first reported Colorado case to hold that a "conscious driver may revoke their statutory consent to a blood draw," and when that revocation occurs, "the police are generally

13

required to obtain a warrant before trying to conduct a blood draw." *Tarr II*, ¶ 22, 549 P.3d at 970. Thus, after *Tarr II*, police officers throughout Colorado are on notice that they must obtain a search warrant to obtain a blood sample from a motorist who revokes their statutory consent — even one whom the officers have probable cause to believe committed vehicular homicide. But police officers were not deemed to know that a warrant was required under these circumstances before the supreme court decided *Tarr II*.

¶ 30 For these reasons, we hold that the trial court did not err by denying Tarr's pretrial motion to suppress the results of the blood draws, albeit on grounds other than those on which the trial court relied. *See Moody v. People*, 159 P.3d 611, 615 (Colo. 2007) (holding that appellate courts have the discretion to affirm decisions on any basis for which there is a record sufficient to permit conclusions of law, even though they may be on grounds other than those on which the trial court relied).

## C. Other Contentions

¶ 31 Because we resolve this case based on the good faith exception to the exclusionary rule, we decline to reach Tarr's remaining contentions. *See, e.g., People v. Vazquez*, 768 P.2d 721, 727 (Colo.

14

App. 1988) ("Because of the result we reach here, we decline to address defendant's other contentions of error.").

## IV.   Disposition

¶ 32     The judgment of conviction is affirmed.

JUDGE BROWN and JUDGE HAWTHORNE concur.

The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division.  Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

**2022COA23**

**No. 18CA0485, *People v. Tarr* — Constitutional Law — Fourth Amendment — Searches and Seizures — Warrantless Blood Draw; Regulation of Vehicles and Traffic — Alcohol and Drug Offenses — Expressed Consent for the Taking of Blood, Breath, Urine, or Saliva**

For the first time, a division of the court of appeals considers whether the broad language of *People v. Hyde*, 2017 CO 24, ¶ 27, 393 P.3d 962, 968-69, stating that "there is no constitutional right to refuse a blood-alcohol test" applies to conscious drivers who refuse to consent to a blood draw, where a law enforcement officer has probable cause to suspect that the driver committed vehicular homicide.  The division concludes that where a law enforcement officer has probable cause to suspect that driver of this offense, the

officer may conduct a blood draw despite the driver's refusal. The division reasons that it must reach this conclusion because it is bound by the supreme court's language in paragraph 27 of *Hyde*.

Although the special concurrence agrees that the division is bound by *Hyde*, it urges the supreme court to reconsider the applicability of Colorado's Expressed Consent Statute to conscious objecting drivers in light of the United States Supreme Court's holding in *Mitchell v. Wisconsin*, 588 U.S. ___, 139 S. Ct. 2525 (2019).

COLORADO COURT OF APPEALS                                    **2022COA23**

Court of Appeals No. 18CA0485
Arapahoe County District Court No. 16CR2335
Honorable Ben L. Leutwyler III, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Christopher Oneil Tarr,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE LIPINSKY
Brown, J., concurs
Furman, J., specially concurs

Announced February 24, 2022

Philip J. Weiser, Attorney General, Brock J. Swanson, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Casey Klekas, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     In a case involving an unconscious driver suspected of driving under the influence of alcohol (DUI), the Colorado Supreme Court broadly pronounced that "there is no constitutional right to refuse a blood-alcohol test" under Colorado's expressed consent statute, section 42-4-1301.1, C.R.S. 2021.  *People v. Hyde*, 2017 CO 24, ¶ 27, 393 P.3d 962, 968-69.  Today we hold that this broad language also applies to conscious drivers who refuse to take a blood-alcohol test when a law enforcement officer has probable cause to suspect that the driver committed vehicular homicide.

¶ 2     Christopher Oneil Tarr appeals his judgment of conviction for second degree murder, attempted second degree murder, vehicular homicide (DUI), vehicular homicide (reckless driving), DUI, reckless driving, and careless driving.  We affirm.

## I.     Background Facts

¶ 3     We begin with a summary of the evidence presented at trial. Tarr and his roommate, R.T., drove together in Tarr's car to a bar to drink and play pool.  R.T. estimated that, over the course of six to eight hours, he and Tarr drank between one and three pitchers of beer.  When they left the bar shortly before midnight, R.T. offered to drive home.  Tarr declined the offer, however, saying he was "fine."

¶ 4     While driving his familiar route home, Tarr accelerated to a high rate of speed to "test[] [the car's] turbo out a little bit," as a mechanic had recently worked on the vehicle.  As the car raced toward an intersection, R.T. saw that the light was red and told Tarr "red light, red light" and "slow the fuck down."  Tarr did not slow down or stop, however.  He ran the red light and attempted to make a left turn.  R.T. "closed his eyes and just prayed."

¶ 5     At that moment, J.M. and D.M. were crossing the intersection in a marked crosswalk.  Traffic camera footage shows Tarr's car skidding as it turns left, rolling over, and coming to a stop in a parking lot.  Although Tarr's car missed J.M., it struck D.M., who died from his injuries.

¶ 6     Officer Ernest Gonzales of the Aurora Police Department was the first law enforcement officer to speak with Tarr following the collision.  Although Tarr denied drinking alcohol that night, Officer Gonzales detected the smell of alcohol on him.

¶ 7     Officer Rolando Gomez then arrived and began questioning Tarr.  Tarr claimed he had been hit by another car going 100 miles per hour.  But he admitted that he had been driving seventy miles

per hour, although he knew the speed limit was between forty and forty-five miles per hour.

¶ 8    Like Officer Gonzales, Officer Gomez smelled alcohol on Tarr's breath and noted that his speech was slurred.  Tarr told Officer Gomez he had not been drinking alcohol but that he had smoked marijuana the previous day.  After Tarr refused medical treatment, Officer Gomez asked Tarr to perform roadside sobriety maneuvers.  Tarr initially agreed, but before Officer Gomez could administer the maneuvers, Tarr complained of a headache and was transported to the hospital.

¶ 9    Blood tests performed at the hospital showed that Tarr's blood alcohol content (BAC) was between .30 and .32 — roughly four times the limit for DUI — at the time of the collision.

¶ 10    The prosecution charged Tarr with (1) vehicular homicide (DUI); (2) vehicular homicide (reckless driving); (3) leaving the scene of a crash resulting in death; (4) DUI; and (5) reckless driving.  It later added sixth and seventh charges: first degree murder (extreme indifference) and attempted first degree murder (extreme indifference).  (At a preliminary hearing, the court dismissed the charge of leaving the scene of a crash.)  After the close of evidence,

defense counsel requested that the jury be instructed, and be provided with a verdict form, on a lesser nonincluded charge of careless driving.

¶ 11    The jury convicted Tarr of the original four charges and the lesser nonincluded charge, as well as the lesser included offenses of the sixth and seventh charges — second degree murder and attempted second degree murder.  The trial court merged Tarr's conviction for reckless driving with his conviction for vehicular homicide (reckless driving) and merged his convictions for vehicular homicide (reckless driving) and DUI with his conviction for vehicular homicide – DUI.  The court sentenced him to forty years in the custody of the Department of Corrections for second degree murder, twenty years for attempted second degree murder, twenty-four years for vehicular homicide (DUI), and one year for careless driving, with the sentences to run concurrently.

## II.    Discussion

¶ 12    Tarr challenges his convictions on the grounds that the trial court erred by denying his motion to suppress the results of his BAC tests.

4

¶ 13    Tarr contests his convictions for second degree murder and attempted second degree murder on three additional grounds. First, he argues that the trial court erred by overruling his objection to the addition of the first degree murder and attempted first degree murder charges because the General Assembly intended that vehicular homicide be the sole applicable offense if a person causes the death of another while driving or operating a motor vehicle. Second, he contends that his conviction for second degree murder violates the Colorado Constitution's equal protection guarantee because there is no reasonable distinction between the conduct proscribed by the second degree murder statute and the conduct proscribed by the vehicular homicide (DUI) statute. Third, Tarr argues the prosecution presented insufficient evidence to sustain these convictions.

¶ 14    We reject these arguments.

## A.    The Blood Draws

¶ 15    Tarr contends that the blood draws were illegal searches under the Fourth Amendment to the United States Constitution and that the trial court erred by concluding they were legal based solely on the language of the expressed consent statute. We disagree.

5

### 1. Additional Facts

¶ 16 Officer Gomez followed the ambulance in which Tarr was transported to the hospital. At the hospital, Officer Gomez called a detective to inform him of the accident, that there was alcohol involved, and that "there was a chance that [D.M.] was not going to survive."

¶ 17 Inside Tarr's hospital room, Officer Gomez advised Tarr of the expressed consent statute. The statute provides that every driver in the state, by virtue of driving in the state, has consented to

> take and complete, and to cooperate in the taking and completing of, any test or tests of the person's breath or blood for the purpose of determining the alcoholic content of the person's blood or breath when so requested and directed by a law enforcement officer having probable cause to believe that the person was driving [under the influence of alcohol].

§ 42-4-1301.1(2)(a)(I).

¶ 18 The officer advised Tarr that his only option for a BAC test was a blood draw, and that his refusal to submit to such a test would result in revocation of his license. Tarr responded, "You're not taking my blood." (The record does not reflect why, once in the hospital, Tarr no longer had the option of submitting to a breath

test.  Tarr does not challenge the accuracy of Office Gomez's statement, however.)

¶ 19    Shortly thereafter, another officer informed Officer Gomez that D.M. had died.  Officer Gomez told Tarr that, because of the fatality, if he did not consent, the blood draw would "have to be done forcefully if need be."  Tarr again refused to consent to a blood draw, although he said he "wouldn't physically resist."

¶ 20    Tarr's blood was drawn three times that morning — at 1:19 a.m., 2:19 a.m., and 3:15 a.m.  (Blood draws over time allow a forensic toxicologist to estimate the rate at which an individual's body eliminates alcohol and then extrapolate the individual's BAC at a particular time.  *See Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2536 (2019) ("Enforcement of BAC limits . . . requires prompt testing because it is 'a biological certainty' that '[a]lcohol dissipates from the bloodstream at a rate of 0.01 percent to 0.025 percent per hour.") (quoting *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) (Roberts, C.J., concurring in part and dissenting in part).)

¶ 21    Tarr filed a pretrial motion to suppress evidence of the results of the blood draws.  The trial court denied the motion, finding that the blood draws were "accomplished within the parameters of the

[expressed consent statute], a recognized exception to the warrant requirement."

## 2. Standard of Review

¶ 22    "Our review of a trial court's ruling on a motion to suppress presents a mixed question of fact and law.  We defer to the trial court's factual findings if those findings are supported by competent evidence in the record; however, we review the trial court's legal conclusions de novo."  *People v. Shoen*, 2017 CO 65, ¶ 8, 395 P.3d 327, 330 (citation omitted).

¶ 23    In addition, we must apply the standard of review for challenges to the constitutionality of a statute if Tarr contends the expressed consent statute is unconstitutional.  Although he asserts that he is not making such an argument, he acknowledges that his appeal addresses "whether 'consent' implied by statute satisfies the Fourth Amendment's requirement of voluntariness when a conscious defendant objects to the State piercing his skin and extracting his blood."  We perceive this argument to be an as-applied challenge to the constitutionality of the expressed consent statute, and we must analyze it as such.  *See People v. Nozolino*, 2014 COA 95, ¶ 19, 350 P.3d 940, 945 ("An as-applied

8

[constitutional] challenge alleges that a statute is unconstitutional as to the specific circumstances under which a defendant acted.").

¶ 24 "The constitutionality of a statute is a legal question that we review de novo. Statutes are presumed to be constitutional, and the challenger bears the burden to prove their unconstitutionality beyond a reasonable doubt." *People v. Torline*, 2020 COA 160, ¶¶ 7-8, 487 P.3d 1284, 1286 (citation omitted) (addressing an as-applied challenge to a Colorado marijuana statute under the Free Exercise Clauses of the Federal and State Constitutions).

### 3. The Fourth Amendment and Statutory Expressed Consent

¶ 25 The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Because a blood draw "involve[s] a compelled physical intrusion beneath [an individual's] skin and into his veins to obtain a sample of his blood for use as evidence in a criminal investigation," it is a "search" within the meaning of the Fourth Amendment. *McNeely*, 569 U.S. at 148.

¶ 26    Although the Fourth Amendment generally requires a warrant for a search by law enforcement officers, the "ultimate measure" of the constitutionality of a governmental search is "reasonableness." *Hyde*, ¶ 16, 393 P.3d at 966 (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995)). A warrantless search is reasonable if it satisfies one of the recognized exceptions to the warrant requirement. *People v. Rodriguez*, 945 P.2d 1351, 1359 (Colo. 1997). Consent is one of the recognized exceptions. *People v. Licea*, 918 P.2d 1109, 1112 (Colo. 1996). A person's consent may justify a warrantless search so long as the consent is "the product of an essentially free and unconstrained choice by its maker." *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).

¶ 27    Tarr's argument implicates two closely related issues: (1) whether a state expressed consent statute can satisfy the Fourth Amendment's warrant requirement for a BAC test, including a blood test; and (2) if so, whether a driver possesses the constitutional right to revoke that consent. The supreme court's decision in *Hyde* addressed both of these issues.

¶ 28    As noted above, anyone who drives a motor vehicle in Colorado is deemed to have consented to the provisions of the expressed

consent statute.  § 42-4-1301.1(1).  These provisions include consent to a blood or breath test to determine the driver's BAC when requested by a law enforcement officer having probable cause to believe that the driver is under the influence of alcohol, drugs, or both.  § 42-4-1301.1(2)(a)(I), (b)(I).

¶ 29    In *Hyde*, the Colorado Supreme Court held that an unconscious driver's statutory consent to BAC testing satisfies the consent exception to the Fourth Amendment's warrant requirement. *Hyde*, ¶¶ 23-24, 393 P.3d at 967-68.  It would be illogical to read *Hyde* to mean that the expressed consent statute is binding on unconscious drivers but not on conscious drivers.  Logically, a driver's physical condition is of no consequence to whether statutory consent satisfies the consent exception to the warrant requirement.

¶ 30    The *Hyde* analysis also involves the second related issue noted above: If statutory consent is sufficient to satisfy the Fourth Amendment, can a conscious driver revoke that consent?  In sweeping language equally applicable to conscious and unconscious drivers, the *Hyde* court stated that "there is no constitutional right to refuse a blood-alcohol test."  *Id.* at ¶ 27, 393 P.3d at 968-69 (first

citing *South Dakota v. Neville*, 459 U.S. 553, 560 n.10 (1983); then citing *Cox v. People*, 735 P.2d 153, 155 n.3 (Colo. 1987); and then citing *Brewer v. Motor Vehicle Div.*, 720 P.2d 564, 568 (Colo. 1986)). "[A]ny opportunity to refuse chemical testing is 'simply a matter of grace bestowed by the [state] legislature.'" *Id.* (alteration in original) (quoting *Neville*, 459 U.S. at 565). The court did not limit this language to cases involving unconscious drivers.

¶ 31 The Colorado General Assembly has bestowed the "grace" to refuse chemical testing on drivers under certain circumstances but has imposed administrative and evidentiary consequences for such refusal. A conscious driver's refusal to submit to testing is admissible against the driver at a trial for DUI or driving while ability impaired, § 42-4-1301(6)(d), C.R.S. 2021, and results in revocation of his or her driver's license for a minimum of one year. § 42-4-1301.1(4); *see also Hyde*, ¶ 24 n.3, 393 P.3d at 968 n.3 (acknowledging that a law enforcement officer may not "forcibly conduct a blood draw on *any* driver who has *revoked* his or her statutory consent by refusing to submit to a blood-alcohol test" because the expressed consent statute forbids forced blood draws except under certain specified circumstances).

12

¶ 32    The General Assembly carved out four scenarios in which the "grace" to refuse a BAC test has not been bestowed.  If a law enforcement officer has probable cause to believe that a driver committed one of four specified offenses, the expressed consent statute "permits a law enforcement officer to force a driver to take a blood test, notwithstanding the driver's refusal." *People v. Raider*, 2021 COA 1, ¶ 2, 490 P.3d 1079, 1081 (*cert. granted* Sept. 13, 2021); *see* § 42-4-1301.1(3).  These four offenses are criminally negligent homicide, vehicular homicide, assault in the third degree, and vehicular assault.  § 42-4-1301.1(3).  Evidence obtained through an involuntary blood test conducted under section 42-4-1301.1(3) is admissible against a driver at a trial for one or more of the four offenses.  § 42-4-1301(6)(e).

4.    The Trial Court Did Not Err by Concluding that the Evidence of the Blood Draws Was Admissible

¶ 33    Tarr argues that *Hyde* should be limited to cases involving unconscious drivers and that we should adopt the view that an expressed consent statute alone does not satisfy the consent exception to the Fourth Amendment.  Alternatively, Tarr urges us to hold that, even if he had consented to the blood draw through the

expressed consent statute, he had a constitutional right to withdraw that statutory consent. But we are bound by the supreme court's holding in *Hyde*. *See People v. Robson*, 80 P.3d 912, 914 (Colo. App. 2003) ("[W]e are bound by the rule as expressed by the Colorado Supreme Court, and we are not free to depart from this precedent.").

¶ 34    Tarr's argument nonetheless finds support in authorities from outside Colorado that call into question *Hyde*'s initial premise: that statutory consent, without more, can satisfy the consent exception to the Fourth Amendment's warrant requirement. *See Hyde*, ¶ 24, 393 P.3d at 968. Thus, if the supreme court were to accept Judge Furman's invitation to reconsider the scope of *Hyde*, it would have an opportunity to consider whether the Colorado expressed consent statute alone can satisfy the consent exception to the Fourth Amendment in situations where a driver, like Tarr, withdraws his statutory consent.

¶ 35    Although the Supreme Court recently analyzed state expressed consent statutes, *see Birchfield v. North Dakota*, 579 U.S. ___, ___, 136 S. Ct. 2160, 2185 (2016); *McNeely*, 569 U.S. at 160-61, those decisions did not consider whether such statutes comply with the

14

consent exception to the Fourth Amendment warrant requirement.

As one commentator noted,

> [I]n none of the three cases collectively decided [in *Birchfield*] does it appear there was an express claim that the implied-consent statute *itself* provides a basis for a warrantless search. And in the more recent Supreme Court decision on the subject, *Mitchell v. Wisconsin*, the plurality opinion relied instead upon the established exigent circumstance exception to the search warrant requirement despite the fact, as the dissent noted, that the state court's "primary argument has always been that Mitchell consented to the blood draw through the State[']s 'implied-consent law.'" Indeed, the plurality emphasized that the Court's prior decision[s] . . . on the subject "have not rested on the idea that these laws do what their popular name might seem to suggest — that is, create actual consent to all the searches they authorized."

4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(*l*) (6th ed. 2020) (footnote omitted). (Although Tarr asserts that Professor LaFave expressly criticized *Hyde*'s reading of *Birchfield* in a supplement to an earlier edition of his treatise, the current edition of the treatise makes no reference to *Hyde*.)

¶ 36 Professor LaFave noted that the Supreme Court may have revealed its thinking on the effectiveness of statutory implied

15

consent in orders it entered following the announcement of *McNeely*. In that case, the Court held that the natural dissipation of alcohol in a person's bloodstream does not create a per se exigency that always justifies a warrantless blood draw. *McNeely*, 569 U.S. at 165. (There appears to be no material distinction between an "expressed consent statute" and an "implied consent statute." *See Raider*, ¶¶ 19-26, 490 P.3d at 1083-85 (applying the same analysis to both types of statutes).)

¶ 37     After announcing *McNeely*, the Supreme Court considered the defendant's petition for writ of certiorari in *Aviles v. State*, 385 S.W.3d 110 (Tex. App. 2012) (*Aviles I*). In that case, the state court had held that statutory implied consent alone was sufficient to justify a warrantless blood draw. *Id.* at 116. The Supreme Court then granted certiorari, vacated the state court's judgment, and remanded the case to the state court "for further consideration" in light of *McNeely*. *Aviles v. Texas*, 571 U.S. 1119 (2014) (mem.).

¶ 38     On remand, the state court concluded that, following the logic of *McNeely*, the mandatory blood draw and implied consent statutes "were not substitutes for a warrant or legal exceptions to the Fourth Amendment warrant requirement." *Aviles v. State*, 443 S.W.3d 291,

16

294 (Tex. App. 2014) (*Aviles II*). Professor LaFave commented that to conclude otherwise "would in effect nullify the Supreme Court's decision in *McNeely*." LaFave, § 8.2(*l*).

¶ 39     Absent a clear pronouncement from the Supreme Court, however, state courts remain divided on whether statutory consent alone can support a warrantless blood draw. Some courts, like our supreme court in *Hyde*, have held that expressed consent statutes alone satisfy the consent exception to the Fourth Amendment warrant requirement. *See State v. Brar*, 2017 WI 73, ¶ 23, 898 N.W.2d 499, 507 ("[L]est there be any doubt, consent by conduct or implication is constitutionally sufficient consent under the Fourth Amendment."); *Bobeck v. Idaho Transp. Dep't*, 363 P.3d 861, 866-67 (Idaho Ct. App. 2015) ("[The defendant] impliedly consented to be tested for alcohol by driving a motor vehicle in Idaho. . . . [Her] statutorily implied consent was effective at the time of the warrantless blood draw as it was justified by Idaho's implied consent statute.").

¶ 40     Others courts, however, like the Texas court that decided *Aviles II*, have interpreted *McNeely*'s language that "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable

17

must be determined case by case based on the totality of the circumstances," 569 U.S. at 156, to mean that an expressed consent statute alone does *not* establish that the consent exception to the Fourth Amendment's warrant requirement has been satisfied. *See State v. Modlin*, 867 N.W.2d 609, 618-19 (Neb. 2015) (holding that "a court may not rely solely on the existence of an implied consent statute to conclude that consent to a blood test was given for Fourth Amendment purposes"); *State v. Henry*, 539 S.W.3d 223, 244 (Tenn. Crim. App. 2017) ("[I]mplied consent does not qualify as consent under the United States . . . Constitution[].").

¶ 41   Further, courts that held statutory consent is sufficient to satisfy the consent exception to the Fourth Amendment's warrant requirement have split on whether a conscious driver possesses a constitutional right to revoke that consent — the second Fourth Amendment issue addressed in *Hyde*. For example, in a case involving a conscious driver who was forced to submit to a blood draw over his objections, the Nevada Supreme Court reasoned that "a driver's so-called consent cannot be considered voluntary," and thus cannot satisfy the consent exception to the Fourth Amendment warrant requirement, if the statute allows law

enforcement to conduct a blood draw despite the driver's revocation of that consent. *Byars v. State*, 336 P.3d 939, 946 (Nev. 2014) (noting that it could find "no jurisdiction that has upheld an implied consent statute that allows an officer to use force to obtain a blood sample upon the driver's refusal to submit to a test"); *see State v. Ryce*, 368 P.3d 342, 369 (Kan. 2016) ("It would be inconsistent with Fourth Amendment principles to conclude consent remained voluntary if a suspect clearly and unequivocally revoked consent."). *But see Cash v. Commonwealth*, 466 S.E.2d 736, 738 (Va. 1996) ("The consent to submit to a blood . . . test, granted when a person operates a motor vehicle upon the highways, 'is not a qualified consent and it is not a conditional consent, and therefore there can be no qualified refusal or conditional refusal to take the test.'" (quoting *Deaner v. Commonwealth*, 170 S.E.2d 199, 204 (Va. 1969)).

¶ 42        While we acknowledge the logic of the reasoning in cases such as *Henry*, 539 S.W.3d at 244, and *Byars*, 336 P.3d at 946, as well as in Professor LaFave's treatise, the expansive language of paragraph 27 of *Hyde* requires us to hold that Tarr consented to the blood test by virtue of the expressed consent statute and, moreover, that he had no constitutional right to refuse the test because the

19

officers had probable cause to believe he had committed vehicular homicide. Thus, under *Hyde*, Tarr was not entitled to the statutory "grace" to revoke his statutory consent and refuse a BAC test.

¶ 43 The plain meaning of section 42-4-1301.1(3) is that a law enforcement officer may require a driver to submit to a blood draw if the officer has probable cause to believe the driver committed vehicular homicide, even if "the [driver] is refusing to take or to complete, or to cooperate in the completing of, any test or tests." The expressed consent statute "indicates that the Colorado legislature did *not* intend to bestow that grace [of refusal]" upon a driver under such circumstances. *See Hyde*, ¶ 28, 393 P.3d at 969.

¶ 44 In sum, we apply *Hyde* as written and hold that, by driving a motor vehicle in the State of Colorado, Tarr consented to a warrantless blood draw in the event a law enforcement officer had probable cause to believe he committed vehicular homicide. § 42-4-1301.1(3). For this reason, the trial court did not err by admitting the evidence of the warrantless blood draws and we need not address Tarr's arguments regarding the applicability of other exceptions to the warrant requirement.

## B. Legislative Preclusion

¶ 45    Tarr contends that the "comprehensive scheme for regulating and punishing intoxicated driving shows that the General Assembly intended Tarr's conduct to be prosecuted and punished" exclusively under the vehicular homicide statutes, and not under the general murder statutes. We are not persuaded.

### 1. Preservation

¶ 46    We agree with the People that this issue is not preserved. Although Tarr claims the issue is preserved because his attorney objected during the preliminary hearing to the added counts of first degree murder and attempted first degree murder, the record shows that Tarr's counsel objected to the added counts on other grounds. During the hearing, counsel did not present a legislative preclusion argument or cite to authorities on legislative preclusion. Because Tarr's counsel did not give the trial court "an adequate opportunity to make findings of fact and conclusions of law" on this issue, it is not preserved for our review. *People v. Heisler*, 2017 COA 58, ¶ 42, 488 P.3d 176, 183 (quoting *People v. Melendez*, 102 P.3d 315, 322 (Colo. 2004)). Thus, we must consider Tarr's legislative preclusion argument under the plain error standard. *People v. Valdez*, 2014

COA 125, ¶ 18, 411 P.3d 94, 99 ("[W]e review unpreserved issues for plain error.").

¶ 47    "To qualify as plain error, an error must generally be so obvious that a trial judge should be able to avoid it without the benefit of an objection." *Scott v. People*, 2017 CO 16, ¶ 16, 390 P.3d 832, 835. "For an error to be this obvious, the action challenged on appeal ordinarily 'must contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law.'" *Id.* (quoting *People v. Pollard*, 2013 COA 31M, ¶ 40, 307 P.3d 1124, 1133). "We reverse under plain error review only if the error 'so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'" *Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116, 120 (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

## 2.    Applicable Law

¶ 48    Under Colorado law, "a single transaction may give rise to the violation of more than one statute." *People v. Blue*, 253 P.3d 1273, 1277 (Colo. App. 2011) (quoting *People v. James*, 178 Colo. 401, 404, 497 P.2d 1256, 1257 (1972)). "The enactment of a specific criminal statute does not preclude prosecution under a general

22

criminal statute unless the language clearly evinces legislative intent to limit prosecution to the specific statute." *People v. Prieto*, 124 P.3d 842, 848 (Colo. App. 2005). In determining whether the General Assembly intended to preclude prosecution under a general statute by enacting a more specific statute, we consider three factors: "(1) whether the specific statute invokes the full extent of state police powers; (2) whether the specific statute is part of a comprehensive regulatory scheme to control an entire substantive area of behavior; and (3) whether the specific statute carefully defines different types of offenses in detail." *Id.*; *see People v. Bagby*, 734 P.2d 1059, 1062 (Colo. 1987). "Where a [specific] statute does not satisfy at least the first two prongs of the [preclusion] test, it does not supplant the general statute." *Blue*, 253 P.3d at 1278.

### 3. The Vehicular Homicide Statute Does Not Evince a Legislative Intent to Preclude Prosecution Under the General Murder Statutes

¶ 49    Tarr has not demonstrated that the vehicular homicide statute, section 18-3-106, C.R.S. 2021, evinces the General Assembly's intent to preclude prosecution under the general murder statutes for causing the death of a person while driving. We

review Tarr's statutory interpretation argument de novo. *See People v. Johnson*, 2021 COA 102, ¶ 15, 498 P.3d 157, 161. Applying the first *Prieto* factor, we perceive no error, much less plain error.

¶ 50 "[W]e see nothing in the language of the vehicular homicide statute . . . that suggests a legislative intent to preempt" the general murder statutes. *Prieto*, 124 P.3d at 848. Even if we did not deem the *Prieto* analysis persuasive, Tarr points to no language in section 18-3-106 that suggests the statute "invokes the full extent of state police powers." *Prieto*, 124 P.3d at 848; *cf. Bagby*, 734 P.2d at 1062 (noting that the General Assembly adopted the Liquor Code as "an exercise of the police powers of the state for the protection of the economic and social welfare and the health, peace and morals of the people of the state" (quoting § 12-47-102(1), C.R.S. 1986)). Moreover, Tarr concedes that "the General Assembly has not made an express declaration [of intent] regarding vehicular homicide."

¶ 51 Rather, Tarr contends that the enactment of the vehicular homicide statute, in and of itself, years after the General Assembly criminalized murder, demonstrates that the General Assembly intended to preclude prosecution of vehicular homicide offenses under the general murder statutes. The historical background of

24

the enactment of a particular statute is not a factor in the legislative preclusion analysis, however. *See Bagby*, 734 P.2d at 1062.

¶ 52 So long as the offenses do not violate constitutional protections such as equal protection, the General Assembly is free to "create a separate crime" to "reach a distinct group of wrongdoers" if it so chooses, without precluding prosecution under a more general statute. *People v. Smith*, 938 P.2d 111, 116 (Colo. 1997); *see People v. Jackson*, 627 P.2d 741, 746 (Colo. 1981). Thus, we hold that, by enacting the vehicular homicide statute, the General Assembly did not intend to bar murder prosecutions of drivers who cause the death of another while behind the wheel.

### C. The As-Applied Equal Protection Claim

¶ 53 Tarr argues that, as applied to his conduct, the second degree murder and vehicular homicide (DUI) statutes violate Colorado's constitutional equal protection guarantee because they proscribe identical conduct. We reject this argument.

¶ 54 We note that, on appeal, Tarr does not present a developed equal protection argument regarding the attempted second degree murder or vehicular homicide (reckless driving) statutes. For this reason, we limit our analysis to Tarr's as-applied equal protection

25

argument focused on the interplay between the second degree murder and vehicular homicide (DUI) statutes.

### 1. Standard of Review

¶ 55    We review the constitutionality of statutes de novo. *People v. Lente*, 2017 CO 74, ¶ 10, 406 P.3d 829, 831.

¶ 56    As with Tarr's legislative preclusion argument, the parties dispute whether Tarr's attorney preserved his equal protection argument. While the record makes clear that Tarr's attorney presented an equal protection argument to the trial court in response to the addition of the first degree murder and attempted first degree murder charges, in such argument, Tarr's attorney did not contend that the charges for the lesser included offenses, including second degree murder, violated Tarr's right to equal protection. But in his appeal, Tarr asserts that the charges for second degree murder and vehicular homicide (DUI) punished him twice for the same conduct and, thus, violated his right to equal protection.

¶ 57    Particularly because this type of equal protection challenge requires an offense-specific analysis, *see infra* Part II.C.2, we agree with the People that Tarr's attorney did not preserve the equal

protection argument focused on second degree murder. *See*

*Thornton v. State*, 539 S.W.3d 624, 628-29 (Ark. Ct. App. 2018)

(holding that, to preserve a challenge to a conviction on a lesser

included offense, a defendant "must anticipate an instruction on a

lesser-included offense and specifically address the elements of that

lesser-included offense" in making his argument to the trial court);

*see also Heisler*, ¶ 42, 488 P.3d at 183. "We review de novo

whether two statutes prohibit the same or different conduct."

*People v. Curtis*, 2021 COA 103, ¶ 32, 498 P.3d 677, 684. Because

Tarr's counsel did not contend in the trial court that the combined

charges under the second degree murder and vehicular

homicide (DUI) statutes violated his right to equal protection, we

will reverse his conviction on this basis only if the district court

plainly erred. *Hagos*, ¶ 14, 288 P.3d at 120.

### 2. Equal Protection and Criminal Offenses

¶ 58    "Our analysis starts with the presumption that the statutes

are constitutional." *Prieto*, 124 P.3d at 846. "Under the Colorado

Constitution, equal protection is violated if different statutes

proscribe the same criminal conduct with disparate criminal

sanctions." *People v. Sharp*, 104 P.3d 252, 255 (Colo. App. 2004).

"Similarly, '[s]tatutes prescribing different sanctions for what ostensibly might be different acts, but offering no rational standard for distinguishing such different acts for purposes of disparate punishment,'" contravene the equal protection guarantee of the Colorado Constitution. *People v. Clanton*, 2015 COA 8, ¶ 26, 361 P.3d 1056, 1061 (quoting *People v. Wilhelm*, 676 P.2d 702, 704 (Colo. 1984)). But "the fact that a single act may give rise to more than one criminal violation does not, by itself, create an equal protection problem." *People v. Madril*, 746 P.2d 1329, 1333 (Colo. 1987).

¶ 59    When evaluating an as-applied equal protection challenge, we consider whether, under the circumstances of the case, "the relevant statutes, or specific subsections of the statutes, punish identical conduct, and whether a reasonable distinction can be drawn between the conduct punished by the two statutes." *People v. Trujillo*, 2015 COA 22, ¶ 21, 369 P.3d 693, 697. "To establish a reasonable distinction between two statutes for purposes of equal protection, the statutory classifications of crimes must be 'based on differences that are real in fact and reasonably related to the general purposes of criminal legislation.'" *People v. Brockelman,*

862 P.2d 1040, 1041 (Colo. App. 1993) (quoting *People v. Mumaugh*,

644 P.2d 299, 301 (Colo. 1982)).

> 3. The Combined Second Degree Murder and Vehicular
> Homicide (DUI) Charges Do Not Violate Tarr's Right to Equal
> Protection

¶ 60    We begin our analysis by reviewing the specific statutes under

which Tarr was charged and convicted.

¶ 61    "A person commits the crime of murder in the second degree if

. . . [t]he person knowingly causes the death of a person . . . ."

§ 18-3-103(1)(a), C.R.S. 2021.  Second degree murder is a class 2

felony.  § 18-3-103(3)(a).

¶ 62    The vehicular homicide (DUI) statute provides:

> If a person operates or drives a motor vehicle
> while under the influence of alcohol or one or
> more drugs, or a combination of both alcohol
> and one or more drugs, and such conduct is
> the proximate cause of the death of another,
> such person commits vehicular homicide.  This
> is a strict liability crime.

§ 18-3-106(1)(b)(I).  Vehicular homicide (DUI) is a class 3 felony.

§ 18-3-106(1)(c).

¶ 63    There are two key differences between the offenses of second

degree murder and vehicular homicide (DUI).  First, the offenses

involve different levels of intent.  To be convicted of second degree

29

murder, a defendant must have acted "knowingly." To act knowingly, a person must be "aware that his conduct is practically certain to cause the result." § 18-1-501(6), C.R.S. 2021. In contrast, vehicular homicide (DUI) is a strict liability offense, requiring only voluntary conduct. *See Prieto*, 124 P.3d at 847. Second, unlike the second degree murder statute, to obtain a conviction under the vehicular homicide (DUI) statute, "the prosecution must demonstrate that the defendant drove or operated a motor vehicle," *People v. Stewart*, 55 P.3d 107, 115-16 (Colo. 2002), and that the defendant was legally intoxicated. These distinctions are not only "real in fact," but also "reasonably related to the general purposes of criminal legislation," *Marcy*, 628 P.2d at 74, such as deterring individuals from more egregious behavior by imposing a harsher penalty for offenses having a greater deleterious impact on society.

¶ 64 As applied to Tarr, the second degree murder statute and the vehicular homicide (DUI) statute do not criminalize the same conduct. Under the prosecution's theory of the case, each offense involved a different sets of facts. Tarr committed vehicular

homicide (DUI) by driving while intoxicated and proximately causing D.M.'s death.

¶ 65 In contrast, the prosecutor argued that Tarr also committed murder because he was aware that driving on the city street at a high rate of speed, failing to stop at the red light despite his roommate's exhortations, and veering into the intersection marked with a crosswalk were practically certain to cause the death of a pedestrian in the crosswalk. During closing argument, the prosecutor described in detail Tarr's decisions leading up to D.M.'s death. Not only did Tarr decide to drive after drinking, but he "chose to enter the intersection at a speed of roughly seventy miles an hour." The light had been red for thirteen seconds before he swerved to the left, despite his roommate's screams that he needed to stop. Such behavior is materially different and more specific than that required for a vehicular homicide (DUI) conviction. Further, Tarr's intoxication at the time is irrelevant for a second degree murder conviction.

¶ 66 Tarr argues that charging him with both second degree murder and vehicular homicide (DUI) nonetheless violated his right to equal protection because "there is no sufficiently pragmatic way

to uniformly decide if a given drunk driver who causes a fatality has done so 'knowingly.'" Under different circumstances, that may be true, such as where the prosecution did not present evidence of the defendant's mental state. But, here, as explained above, the prosecution did present evidence regarding Tarr's mental state. Because of these additional facts, the jury was able to find that Tarr was not only intoxicated and the proximate cause of D.M.'s death, but also that he knew his behavior was practically certain to result in the death of a pedestrian in the crosswalk.

## D. Sufficiency of the Evidence

¶ 67 Tarr contends that the evidence introduced at trial was insufficient to sustain his convictions for second degree murder and attempted second degree murder. We are not persuaded.

### 1. Standard of Review

¶ 68 We review sufficiency of the evidence claims de novo. *McCoy v. People*, 2019 CO 44, ¶ 27, 442 P.3d 379, 387.

### 2. Applicable Law

¶ 69 "The Due Process Clauses of the United States and Colorado Constitutions require proof of guilt beyond a reasonable doubt on

32

each of the essential elements of a crime." *People v. Duncan,* 109

P.3d 1044, 1045 (Colo. App. 2004).

> A challenge to the sufficiency of the evidence
> requires a reviewing court to determine
> whether the evidence, both direct and
> circumstantial, when viewed as a whole and in
> a light most favorable to the prosecution, is
> sufficient to support a conclusion by a
> reasonable fact finder that the defendant is
> guilty of the crime charged beyond a
> reasonable doubt.

*Id.* "The conviction must be upheld 'if there is substantial evidence

in the record, viewed in the light most favorable to the prosecution,

that supports the verdict.'" *Mata-Medina v. People*, 71 P.3d 973,

983 (Colo. 2003) (quoting *People v. Fuller*, 791 P.2d 702, 706 (Colo.

1990)).

¶ 70    "Because jury verdicts deserve deference and a presumption of

validity," *id.*, in making this determination, the reviewing court

"must give the prosecution the benefit of every reasonable inference

that might fairly be drawn from the evidence, and the resolution of

inconsistent testimony and determination of the credibility of the

witnesses are solely within the province of the jury," *Duncan*, 109

P.3d at 1045-46.  Thus, although a verdict "cannot be supported by

guessing, speculation, conjecture, or a mere modicum of relevant

evidence," the reviewing court "should not attempt to 'serve as a thirteenth juror or invade the province of the jury'" by weighing conflicting evidence. *People v. Perez*, 2016 CO 12, ¶ 25, 367 P.3d 695, 701 (quoting *People v. Bennett*, 183 Colo. 125, 130, 515 P.2d 466, 469 (1973)).

### 3.  Tarr's Sufficiency Arguments Lack Support and Are Undeveloped

¶ 71     As noted above, to find Tarr guilty of second degree murder, the jury needed to find that Tarr acted knowingly — that he was aware at the time his speeding vehicle struck D.M. that his conduct was "practically certain to cause the result." § 18-1-501(6).

¶ 72     Tarr argues that the prosecution did not present sufficient evidence to prove that he "knew his conduct was practically certain to cause death because his conduct was not, in fact, practically certain to cause death." In support of this contention, Tarr cites statistics and studies on the probability of a traffic fatality resulting from a single incident of driving under the influence. But we agree with the People that, because Tarr did not present these statistics and studies to the jury, we may not consider them. *See People v. Henson*, 2013 COA 36, ¶ 7, 307 P.3d 1135, 1137 (holding that,

"because our review is limited to the record on appeal," the court would not consider evidence presented for the first time in an appellate brief).

¶ 73    Similarly, Tarr argues that the evidence could not have proved that he acted knowingly because "death is a random rather than inevitable result of the reckless conduct of a highly intoxicated driver." He does not point to record evidence or any legal authorities that support this argument, however. "Because this is an undeveloped assertion of error lacking support in legal authority, we decline to address it." *People v. Lowe*, 2021 CO 51, ¶ 20 n.4, 488 P.3d 1122, 1126 n.4.

¶ 74    In any event, we note that the record evidence established that

- Tarr was familiar with the intersection, as it was on his usual route home;

- the intersection was a busy one, with businesses on all four corners;

- the intersection had a significant volume of pedestrian traffic;

- even though the incident occurred at night, the intersection was well-lit at the time;

- Tarr knew the speed limit was between forty and forty-five miles per hour but nonetheless drove into the intersection at seventy miles per hour;

- the traffic light had been red for thirteen seconds before Tarr drove through the intersection;

- the traffic camera videos showed that the headlights of a vehicle stopped at the intersection illuminated D.M. and J.M. and that the victims were plainly visible to a driver making a left turn toward the crosswalk;

- Tarr drove straight into the victims while they were in the crosswalk; and

- Tarr ignored R.T.'s admonition to slow down and shouts that the light was red.

¶ 75    In light of this evidence, and given the deference we must afford the jury's verdict, we cannot say that the jury was presented with insufficient evidence to find that Tarr acted knowingly when he sped into the intersection.

III.   Conclusion

¶ 76    The judgment is affirmed.

JUDGE BROWN concurs.

JUDGE FURMAN specially concurs.

JUDGE FURMAN, specially concurring.

¶ 77 Under the Fourth Amendment, are police permitted to conduct a warrantless blood draw from a *conscious* driver — who they have probable cause to believe has committed vehicular homicide — even though the driver has clearly stated that he does not consent to the blood draw?

¶ 78 The majority answers this question in the affirmative. It does so based on a provision of Colorado's Expressed Consent Statute — section 42-4-1301.1(3), C.R.S. 2021 — and expansive language about implied consent employed by our supreme court in *People v. Hyde*, 2017 CO 24 — a case involving an *unconscious* driver. *See id.* at ¶ 27 (holding that "there is no constitutional right to refuse a blood-alcohol test").

¶ 79 I conclude that the majority's analysis is correct because of the breadth of the language employed by the supreme court in *Hyde* and our duty to follow our supreme court's precedent. *See People v. Robson*, 80 P.3d 912, 914 (Colo. App. 2003). I therefore concur.

¶ 80 But I write separately to urge our supreme court to address this difficult question considering the more recent decision by the

38

United States Supreme Court in *Mitchell v. Wisconsin,* 588 U.S. ___, 139 S. Ct. 2525 (2019). The *Hyde* court did not have the benefit of *Mitchell.* In *Mitchell,* the Supreme Court seemed to signal an important clarification of its jurisprudence on warrantless blood draws from drivers suspected of alcohol-related driving offenses. The Court appears to be moving away from implied consent created by statute and back to more traditional Fourth Amendment principles — those being the warrant requirement and the established exceptions to the warrant requirement.

¶ 81      In *Mitchell,* a driver, in challenging his conviction for driving under the influence (DUI), argued that Wisconsin police violated his rights under the Fourth Amendment when they conducted a warrantless draw of his blood while he was unconscious. *See id.* at ___, 139 S. Ct. at 2530-32. The State of Wisconsin argued that by driving on Wisconsin's roads, the driver had consented to the blood draw based on provisions of Wisconsin's implied consent statute. *See id.* This statute, much like Colorado's, authorizes police to conduct a warrantless blood draw from an unconscious driver if a law enforcement officer has probable cause to believe the driver is under the influence of alcohol. *See id.* The Supreme Court granted

39

certiorari on "[w]hether a statute authorizing a blood draw from an unconscious motorist provides an exception to the Fourth Amendment warrant requirement." *Id.* at ___, 139 S. Ct. at 2532.

¶ 82 The plurality in *Mitchell* noted that while prior decisions of the Supreme Court had "referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences" on drivers who refuse to comply with blood alcohol concentration testing, these decisions "have not rested on the idea that [implied consent] laws do what their popular name might seem to suggest — that is, create actual consent to all the searches they authorize." *Id.* at ___, 139 S. Ct. at 2532-33 (quoting *Birchfield v. North Dakota,* 579 U.S. ___, 136 S. Ct. 2160, 2185 (2016)). The plurality clarified that the Court has "based [its prior] decisions on the precedent regarding the specific constitutional claims in each case, while keeping in mind the wider regulatory scheme developed over the years to combat drunk driving." *Id.* at ___, 139 S. Ct. at 2533. The plurality then resolved the controversy in *Mitchell* based on the exigent circumstances exception to the Fourth Amendment. *See id.* at ___, 139 S. Ct. at 2538-39.

¶ 83     Justice Sotomayor's dissent in *Mitchell* put it more plainly:

"The plurality does not rely on the consent exception here.  With that sliver of the plurality's reasoning I agree.  I would go further and hold that the state statute, however phrased, cannot itself create the actual and informed consent that the Fourth Amendment requires."  *Id.* at ___, 139 S. Ct. at 2545 (Sotomayor, J., dissenting) (citation omitted).

¶ 84     Given this important clarification in jurisprudence, I urge our supreme court to address the question posed by Tarr's case after *Mitchell.*